No. 26-1094

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

## IN RE ENVIRONMENTAL WORKING GROUP,
## PETITIONER

On Petition for a Writ of Mandamus and for Relief from Unreasonably Delayed
Agency Action by the Environmental Protection Agency

---

## PETITION FOR WRIT OF MANDAMUS

---

CAROLINE LEARY
Environmental Working Group
1250 I St NW, Suite 1000
Washington, DC 20005
(202) 667-6982
cleary@ewg.org

*Counsel for Petitioner*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to District of Columbia Circuit Rule 28(a)(1), counsel for Petitioner Environmental Working Group certifies as follows:

**A. Parties**

Petitioner Environmental Working Group is a nonprofit, tax-exempt organization. Respondent is the United States Environmental Protection Agency, which administers and enforces FIFRA, the FFDCA, and related statutes. No intervenors have appeared, and Petitioner is not aware of any amici curiae in this matter.

**B. Rulings Under Review**

Petitioner Environmental Working Group seeks a writ of mandamus compelling EPA to take action unlawfully withheld or unreasonably delayed in response to its petition requesting that EPA revoke or modify the tolerance for glyphosate on oats and restrict pre-harvest uses that drive dietary exposure, as required by the Federal Food, Drug, and Cosmetic Act and the Administrative Procedure Act.

**C. Related Cases**

Petitioner is not aware of any related cases currently pending before this Court or any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner Environmental Working Group makes the following disclosure. Environmental Working Group is a nonprofit corporation organized under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock or membership interests.

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES…….ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT……….…………iii

TABLE OF AUTHORITIES ....................................................................v

GLOSSARY ...................................................................... xiii

INTRODUCTION.................................................................1

STATEMENT REGARDING ADDENDA......................................2

STATEMENT OF JURISDICTION AND APPLICABLE LAW ......................3

ISSUE PRESENTED FOR REVIEW ...................................................4

BACKGROUND.................................................................4

    I.    The Statutory Framework Imposes a Mandatory Duty on EPA to Act. 4

    II.    Dietary Glyphosate Exposure in Food Poses Heightened Risks to Infants and Young Children.................................................................7

    III.    EWG's Petition to Modify Glyphosate Tolerances on Oats and Restrict Pre-harvest Uses. ..................................................................11

    IV.    EPA's Actions and Continued Failure to Act following EWG's Petition. ..................................................................... 13

SUMMARY OF ARGUMENT ........................................................15

STANDING ..............................................................................16

ARGUMENT ..............................................................................21

I.     EPA Has Unlawfully Withheld Action It Is Required to Take on EWG's Petition. ..................................................................................22

II.    The TRAC Factors Compel Mandamus Relief..........................................24

    A. EPA's Seven-Year Delay, Driven by Its Deferral to Registration Review, Violates Any Plausible Rule of Reason............................25

    B. Congress's Statutory Scheme Requires Timely Agency Action. ...29

    C. EPA's Delay is Especially Intolerable When Children's Health is at Stake. ..........................................................................................30

    D. EPA's Delay Prejudices Statutory Interests and Frustrates Judicial Review .........................................................................................33

III.   The Court should issue a writ of mandamus and retain jurisdiction to ensure EPA promptly resolves the Petition ...........................................................35

CONCLUSION .............................................................................................36

CERTIFICATE OF COMPLIANCE .................................................................38

CERTIFICATE OF SERVICE.........................................................................39

# TABLE OF AUTHORITIES

## Judicial Decisions

*American Legal Found. v. FCC*, 808 F.2d 84 (D.C. Cir. 1987)................................................................................20

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015) ...............19

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...................................19

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)....................20

*In re Am. Rivers*, 372 F.3d 413 (D.C. Cir. 2004) ........................................26, 36

*In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000).....................22, 26, 36

*In re Ctr. for Biological Diversity & Ctr. for Food Safety* 53 F.4th 665 (D.C. Cir. 2022)..................................................................................6, 26,31, 33, 36

*In re Core Commc'ns, Inc.*, 531 F.3d 849 (D.C. Cir. 2008) ...................22, 26, 36

*In re Int'l Chem. Workers Union*, 958 F.2d 1144 (D.C. Cir. 1992)....................18

*In re Medicare Reimbursement Litig.*, 414 F.3d 7 (D.C. Cir. 2005)....................22

*In re Nat'l Nurses United*, 47 F.4th 746 (D.C. Cir. 2022) ...............................22

*League of United Latin American Citizens v. Regan*, 996 F.3d 673 (9th Cir. 2021) ..................................................................................................7, 28

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...................................................17

*Mass. v. EPA*, 549 U.S. 497 (2007)..............................................................17, 21

*N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997)

..................................................................................................................3, 22

*NRDC v. EPA*, 38 F.4th 34 (9th Cir. 2022).................................................14, 28

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004)............................5, 23

*Public Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21 (D.C. Cir. 1984)....................................................................................18, 25, 31

*Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) 17

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ..................................................................................4, 18, 24, 34

## Statutes

5 U.S.C. § 555 ................................................................................23

5 U.S.C. § 706(1) ..............................................................7, 22, 23, 35

7 U.S.C. § 136a(g)....................................................................7, 28

21 U.S.C. § 346a .......................................4, 5, 7, 11, 28, 29, 30, 34

28 U.S.C. § 1651(a)...............................................10, 11, 22, 35

# GLOSSARY

| Term | Definition |
|------|------------|
| **APA** | Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. |
| **EPA** | United States Environmental Protection Agency |
| **EWG** | Environmental Working Group |
| **FFDCA** | Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 et seq. |
| **FIFRA** | Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 et seq. |

**INTRODUCTION**

This case concerns EPA's failure to act on evidence that glyphosate, the most widely used herbicide in the United States and globally, is exposing infants and young children to harmful levels through everyday foods. Congress required EPA to ensure that pesticide residues in food are safe, with particular protection for children. Yet, more than seven years after being presented with substantial scientific evidence that the current tolerance for glyphosate in oats may not meet that standard, EPA has failed to make any final, reviewable determination.

In 2018, Petitioner Environmental Working Group ("EWG"), together with co-petitioners[1], filed a formal administrative petition ("the Petition") under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 346a(d), requesting that EPA revoke or modify the glyphosate tolerance for oats and restrict the use of glyphosate as a pre-harvest desiccant. As amended in 2019, the Petition presents evidence that existing tolerance levels are not protective of infants and young children and that pre-harvest

---

[1] EWG's co-petitioners included Amy's Kitchen, Inc.; Ben & Jerry's Homemade, Inc.; Clif Bar and Company; Earth's Best Organic; GrandyOats; Happy Family Organics; Independent Natural Food Retailers Association; KIND Healthy Snacks; Lundberg Family Farms; MegaFood; MOM's Organic Market; National Co+op Grocers; Nature's Path Foods Inc.; One Degree Organic Foods USA, Inc.; Organic Valley; Patagonia Provisions; PCC Community Markets; and Stonyfield Farm, Inc.

use of glyphosate predictably increases dietary exposure in foods commonly consumed by children.

Instead of issuing the decision required by law, EPA has declined to resolve the Petition and has tethered any response to a broader registration review process, stating only that it anticipates addressing the Petition in connection with a possible decision in 2026. That is neither a deadline, nor a commitment. It is an open-ended deferral entirely within the agency's control.

In the meantime, EPA leaves in place a food safety standard it has never evaluated in light of the Petition's evidence, including evidence that infants and young children, who face the highest dietary exposure, may be at particular risk. The statute does not permit EPA to postpone that determination indefinitely while exposure continues.It also prevents any judicial review of that evidence from occurring.

EWG therefore seeks a writ of mandamus compelling EPA to perform the discrete act required by law by issuing a final, reviewable response resolving the Petition.

## STATEMENT REGARDING ADDENDA

Relevant statutes, regulations, supporting declarations, and exhibits are submitted as separate addenda.

## STATEMENT OF JURISDICTION AND APPLICABLE LAW

This Court has jurisdiction pursuant to the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 346a(h)(1), which vests exclusive jurisdiction in the United States Court of Appeals for the District of Columbia Circuit to review final orders of the EPA establishing, modifying, or revoking pesticide tolerances.

Although EPA has failed to issue a final response to EWG's Petition this Court has authority under the Administrative Procedure Act ("APA") to compel agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1). The APA requires agencies to conclude matters presented to them "within a reasonable time." *Id*. § 555(b).

This Court also has authority under the All Writs Act, 28 U.S.C. § 1651(a), to issue a writ of mandamus in aid of its prospective jurisdiction. Mandamus relief is appropriate when an agency's inaction prevents the issuance of a final, reviewable order and thereby frustrates this Court's exercise of its exclusive jurisdiction. *N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d at 758.

EPA's failure to respond to EWG's Petition has prevented the issuance of a final, reviewable agency action and delayed this Court's exercise of its jurisdiction under the FFDCA. Accordingly, this Court has jurisdiction to

consider this Petition and to grant appropriate relief compelling EPA to perform the discrete, legally required act of issuing a final decision.

## ISSUE PRESENTED FOR REVIEW

Whether the EPA's failure, for more than seven years, to issue a final, reviewable decision resolving EWG's Petition seeking revision of the glyphosate tolerance on oats and prohibition of pre-harvest desiccation constitutes agency action unlawfully withheld or unreasonably delayed in violation of the Administrative Procedure Act warranting mandamus relief.

## BACKGROUND

### I. The Statutory Framework Imposes a Mandatory Duty on EPA to Act.

Mandamus relief is appropriate where an agency has a clear duty to act, the petitioner has a clear right to relief, and no other adequate remedy exists. *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984). Although courts do not use mandamus to direct how an agency exercises its discretion, they may compel an agency to perform a discrete, legally required act that has been unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

The Federal Food, Drug, and Cosmetic Act ("FFDCA") authorizes EPA to establish and maintain tolerances for pesticide chemical residues in food. 21 U.S.C. § 346a. EPA may allow a pesticide residue in food only if it determines that the tolerance is "safe," meaning that there is a reasonable certainty that no harm will result from aggregate exposure to the pesticide, including dietary exposure. *Id*. § 346a(b)(2)(A)(ii). Congress strengthened and clarified these requirements through the Food Quality Protection Act of 1996 ("FQPA"), Pub. L. No. 104-170, 110 Stat. 1489, which amended the FFDCA to establish a uniform, health-based safety standard for pesticide residues in food.

In making safety determinations, Congress directed EPA to afford special protection to infants and children. *Id*. § 346a(b)(2)(C). The statute requires EPA to ensure that tolerances are protective of children and, in most circumstances, to apply an additional tenfold margin of safety to account for pre- and post-natal toxicity and data uncertainties. *Id*. These provisions reflect Congress's judgment that children are uniquely vulnerable to pesticide exposure and that tolerance decisions must be both health-protective and timely.

The FFDCA further establishes a mandatory petition process to ensure agency accountability. Any person may petition EPA to establish, modify, or

5

revoke a pesticide tolerance. 21 U.S.C. § 346a(d)(1). EPA must issue a final decision either granting or denying the requested relief, supported by a reasoned explanation. *Id*. § 346a(d)(4)(A). That decision constitutes final agency action subject to judicial review in the courts of appeals. *Id*. § 346a(h)(1). EPA thus has a discrete statutory duty to resolve a properly filed petition. *See Norton*, 542 U.S. at 64 (courts may compel agency action where a statute requires a discrete, legally required act).

Independent of the FFDCA, the Administrative Procedure Act ("APA") requires agencies to conclude matters presented to them "within a reasonable time." 5 U.S.C. § 555(b). When an agency fails to take a discrete action it is required to take, courts "shall compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1). This duty is enforceable where an agency has failed to act on a matter it is required to decide. *See SUWA*, 542 U.S. at 64; *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022).

EPA also regulates pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), which requires periodic registration review of approved pesticides. 7 U.S.C. § 136a(g). Registration review is a multi-year, iterative process through which EPA evaluates whether existing pesticide registrations continue to meet applicable statutory standards. *Id*.

The FIFRA registration process is distinct from, and does not displace, the petition process established under the FFDCA. *See League of United Latin American Citizens v. Regan*, 996 F.3d 673, 715 (9th Cir. 2021) ("The EPA's obligations under the FFDCA are linked to a single issue, safety, but they are mandatory. The whole point of the FQPA would be destroyed if the EPA could exercise unfettered discretion to defer safety considerations until it was prepared to engage in the full multi-factor balancing assessment required for FIFRA registration.").

## II. Dietary Glyphosate Exposure in Food Poses Heightened Risks to Infants and Young Children.

Glyphosate is the most widely used herbicide in the United States and globally. APP-001, 066; Dr. Andrews Decl. ¶5. Its use extends beyond weed control during crop growth and includes pre-harvest applications on certain crops, including oats, often for weed control immediately prior to the harvest. APP-066; Dr. Andrews Decl. ¶5. When applied at this stage of the growing cycle, glyphosate can function to accelerate crop dry-down and facilitate harvest, resulting in residues in harvested grain and in foods made from those grains. APP-066; Dr. Andrews Decl. ¶5. Because these applications occur shortly before harvest, glyphosate can be directly

7

transported into the edible portion of the plants where it does not readily break down. APP-066; Dr. Andrews Decl. ¶5.

As a result of this late-stage use, dietary exposure to glyphosate through food is pervasive. APP-066; Dr. Andrews Decl. ¶6. Multiple testing efforts, including those conducted by EWG and others, have detected glyphosate residues in a wide range of commonly consumed foods, including oat-based cereals, snacks, and other products frequently marketed to and consumed by children.[2] APP-003, 067; Dr. Andrews Decl. ¶6.

Oats are a particularly significant source of dietary exposure for infants and young children. APP-067; Dr. Andrews Decl. ¶7. Oat-based products are widely used in infant cereals, breakfast foods, and snack products consumed regularly, often daily, by young children. APP-067; Dr. Andrews Decl. ¶7. Because children consume more food per unit of body weight than adults, repeated consumption of oat-based foods containing glyphosate residues can contribute disproportionately to aggregate dietary

---

[2] EWG's testing detected glyphosate residues in 43 of 45 oat-based food products tested, including products specifically marketed to children. APP-006, 067; Dr. Andrews Decl. ¶6. In 31 of those products, glyphosate levels exceeded 0.16 parts per million, an EWG scientists' calculated benchmark derived from the California's proposed No Significant Risk Level of 1.1 milligrams/day with added Food Quality Protection Act safety factors, and several products contained residues exceeding 1.0 part per million. APP-006, 067; Dr. Andrews Decl. ¶7.

exposure during early developmental periods.APP-67; Dr. Andrews Decl. ¶7.

EPA has acknowledged that young children experience the highest body weight dietary exposure to glyphosate. APP-67; Dr. Andrews Decl. ¶7. In its own risk assessments, EPA has identified children aged one to two years as the population subgroup with the greatest exposure relative to body weight. APP-067; Dr. Andrews Decl. ¶7. EPA has further recognized that this elevated exposure reflects differences in consumption patterns and body weight, which can result in higher exposure on a per-body-weight basis for infants and young children. APP-068; Dr. Andrews Decl. ¶8. Separately, EPA has recognized that infants and young children may be more susceptible to the effects of chemical exposure during critical windows of developmental APP-068; Dr. Andrews Decl. ¶9.

Dietary exposure to glyphosate results in measurable internal exposure. Biomonitoring studies cited in the Petition detected glyphosate or its primary metabolite in a majority of tested urine samples, with detection frequencies increasing over time. APP-002, 007, 0008; Dr. Andrews Decl. ¶10. One longitudinal analysis cited in the Petition found that detection rates for glyphosate in American adults increased from approximately 12 percent of samples in the early 1990s to more than 70 percent by 2016. APP-002,

068; Dr. Andrews Decl. ¶10. These findings confirm that glyphosate exposure is not theoretical or episodic, but widespread, and that dietary intake results in measurable body burden. APP-068; Dr. Andrews Decl. ¶10.

Scientific concern regarding glyphosate exposure leading to health harm has existed for decades. APP-068; Dr. Andrews Decl. ¶10. In 2015, the International Agency for Research on Cancer classified glyphosate as "probably carcinogenic to humans," based on "sufficient" evidence of carcinogenicity in experimental animals and limited evidence of carcinogenicity in humans. APP-069; Dr. Andrews Decl. ¶11. The human evidence included epidemiological studies showing positive associations between glyphosate exposure and non-Hodgkin lymphoma. APP-010, 069; Dr. Andrews Decl. ¶11.

EPA has not maintained a consistent or unequivocal position on glyphosate's carcinogenic potential. Over time, EPA's assessments have reflected internal disagreement, acknowledged data gaps, and shifting analytical approaches. APP-009. EPA scientists and advisory panels have recognized statistically significant findings of health harm in animal studies, dose-response trends, and epidemiological associations that warranted further consideration. APP-012, 069; Dr. Andrews Decl. ¶12. EPA's own Scientific Advisory Panel identified inconsistencies in the evaluation of

conflicting data and dismissal of positive finding trends within EPA's risk-assessment framework. APP-014, 069; Dr. Andrews Decl. ¶12. EPA has acknowledged that some epidemiological evidence shows a positive association between glyphosate exposure and cancer outcomes, while nonetheless characterizing that evidence as insufficient to trigger a carcinogenic risk assessment. APP-009-10, 069; Dr. Andrews Decl. ¶12. During the time EPA has not acted on the petition, glyphosate has continued to be used in food production, including on oats, and consumers have continued to be exposed through commonly consumed foods. APP-073; Dr. Andrews Decl. ¶24. This failure underscores the need for a final, reviewable determination addressing whether the current tolerance satisfies the FFDCA's health-protective standard.

### III. EWG's Petition to Modify Glyphosate Tolerances on Oats and Restrict Pre-harvest Uses.

On September 27, 2018, EWG and co-petitioners submitted the Petition to the EPA pursuant to the FFDCA, 21 U.S.C. § 346a(d). APP-001. EWG amended the Petition on March 28, 2019. APP-001.

First, the Petition requested that EPA modify the tolerance for glyphosate residues on oats. APP-001; 071; Dr. Andrews Decl. ¶18. At the time the Petition was filed, the tolerance permitted residues of up to 30 parts per million (ppm). APP-070; Dr. Andrews Decl. ¶15. The Petition explained

that this tolerance had been substantially increased in the 1990s to harmonize U.S. standards with international trade requirements, rather than based on new evidence demonstrating greater safety. APP-070; Dr. Andrews Decl. ¶15. The Petition requested that EPA reduce the tolerance to 0.1 ppm, the level that applied prior to the 1997 and 2008 increase, and evaluate whether any higher tolerance could be shown to meet the FFDCA's safety standard, particularly for infants and children. APP-001-02. Because glyphosate is so widely used, and because oats and oat-derived products are a common part of the American diet, particularly for infants and young children, dietary exposure to glyphosate through food is effectively unavoidable for many consumers. APP-070; Dr. Andrews Decl. ¶16. Individuals cannot reasonably eliminate exposure through personal choice alone, especially where foods perceived as healthy or appropriate for children are among the primary sources of exposure, nor should they be expected to do so. APP-070-71; Dr. Andrews Decl. ¶16.

Second, the Petition requested that EPA prohibit the use of glyphosate as a pre-harvest desiccant on oats. APP-001, 071; Dr. Andrews Decl. ¶19. The Petition explained that this agricultural practice involves application of glyphosate shortly before harvest and results in significantly higher residues in harvested grain and finished food. APP-071; Dr. Andrews Decl. ¶19. The

12

Petition further explained that pre-harvest desiccation is not necessary for weed control and that its primary effect is to facilitate harvesting, rather than to protect crop yield. APP-071; Dr. Andrews Decl. ¶19.

In support of these requests, the Petition presented scientific evidence concerning dietary exposure to glyphosate, including data showing that oat-based foods frequently consumed by children contain higher glyphosate residues than many other staple grains. APP-072; Dr. Andrews Decl. ¶20. The Petition emphasized that young children experience the highest dietary exposure to glyphosate and that the existing tolerance does not adequately account for the potential health risks associated with that level of exposure, including carcinogenic risks. APP-008-010, 072; Dr. Andrews Decl. ¶10. The Petition requested that EPA respond by granting or denying the requested relief and providing a reasoned explanation supported by the administrative record.

## IV. EPA's Actions and Continued Failure to Act following EWG's Petition.

EPA accepted the Petition for review, published it for public comment and received substantial public input. APP-022-23 Yet, EPA did not issue a final, reviewable decision. APP-073; Dr. Andrews Decl. ¶22. In January 2020, EPA expressly recognized the Petition in its Interim Registration

Review Decision ("Interim Decision") but made clear that the decision "does not constitute EPA's response" to EWG's Petition. APP-025. Instead, EPA stated that it *anticipated* issuing a response at a later time in 2020. APP-025. EPA did not do so. APP-073, Dr. Andrews Decl. ¶22.

In 2022, in litigation challenging EPA's Interim Decision, the Ninth Circuit vacated and remanded the human health portion of the decision, holding that EPA's conclusion regarding cancer risk was not supported by substantial evidence and that EPA had violated the Endangered Species Act by failing to make the required effects determinations. *See NRDC v. EPA*, 38 F.4th 34, 43 (9th Cir. 2022).

Following that decision, EPA withdrew the Interim Decision and confirmed that it had not resolved the Petition. APP-056. EPA stated that it intends to respond to the Petition "before issuing a final registration review decision for glyphosate" and indicated that it anticipates issuing that final registration review decision in 2026. APP-056.

EPA has thus taken the position that it will not resolve the Petition independently, but instead will address it in connection with the broader registration review process after completing its ongoing work on remand. That approach effectively defers a discrete duty imposed by the FFDCA to a multi-year process of EPA's own design and leaves the Petition without any

14

defined timeline for resolution.

## SUMMARY OF ARGUMENT

EPA has unlawfully withheld and unreasonably delayed action on EWG's Petition seeking to revise the glyphosate tolerance for oats and restrict the use of glyphosate as a pre-harvest desiccant. For more than seven years, EPA has neither granted nor denied the petition.

That inaction has real consequences for public health, particularly for infants and young children. The petition presents evidence that the current tolerance may not be protective of children, yet EPA has never made a final, reviewable determination addressing that evidence. As a result, EPA continues to permit dietary exposure to glyphosate through foods commonly consumed by children without deciding whether that exposure satisfies the FFDCA's safety standard. Congress required EPA to ensure that pesticide tolerances are safe, with particular protection for children. EPA's failure to act leaves that mandate unfulfilled.

First, EPA's delay fails any plausible "rule of reason." EPA has allowed the Petition to remain unresolved for years and has deferred decisionmaking to a broader registration review process governed by a self-imposed, nonbinding timeline that it merely anticipates completing in 2026. That open-ended, self-imposed timeline provides no assurance of

15

action and cannot justify prolonged inaction on a discrete statutory duty. Additionally, FIFRA registration review does not displace EPA's independent obligation under the FFDCA to resolve a tolerance petition, nor does it permit EPA to defer that duty indefinitely. EPA's decision to fold the petition into a broader, multi-year process of its own design cannot excuse its failure to act.

Second, the delay is especially intolerable because it concerns human health, and specifically children's health. The petition addresses dietary exposure to a pesticide that EPA acknowledges disproportionately affects infants and young children. Where potential risks to children are at stake, delay is least tolerable and weighs heavily in favor of relief.

Finally, EPA's inaction frustrates the statutory scheme Congress established by preventing judicial review altogether. The FFDCA provides for direct appellate review of final tolerance decisions, but EPA's refusal to issue such a decision effectively insulates its inaction from review. Absent mandamus relief, EPA can continue to avoid resolving the petition indefinitely.

## STANDING

EWG has standing to seek mandamus relief because EPA's prolonged failure to respond to EWG's Petition deprives EWG of a procedural right

guaranteed by statute and increases the risk of harm to concrete interests Congress sought to protect, including human health and the safety of infants and young children. That procedural injury alone is sufficient to establish standing in an unreasonable-delay case. EWG also independently satisfies Article III through organizational and associational standing.

To establish injury in fact, a petitioner must ordinarily show an invasion of a legally protected interest that is concrete and particularized. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). When a petitioner asserts the denial of a procedural right conferred by statute, however, courts apply a "substantially relaxed" standing inquiry. *Id*. at 572 n.7; *Mass v. EPA*, 549 U.S. 497, 517–18 (2007).

In procedural-injury cases, a petitioner need not demonstrate that compliance with the required procedure would have changed the ultimate outcome. *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002). It is sufficient that the agency's failure to follow required procedures deprives the petitioner of a legally mandated decisionmaking process and increases the risk of harm to concrete interests protected by the statute. *Public Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 32–33 (D.C. Cir. 1984).

The FFDCA authorizes any person to petition EPA to modify or revoke a pesticide tolerance, and the APA entitles petitioners to a reasoned response within a reasonable time. *See* 21 U.S.C. § 346a(d); 5 U.S.C. §§ 555(b), 706(1). EPA's failure to act deprives EWG of that process and prevents the issuance of a final, reviewable decision. That deprivation is itself a concrete injury. This Court has repeatedly recognized that the denial of a required agency decision, and the resulting inability to obtain judicial review, constitutes a cognizable injury in unreasonable-delay cases. *See In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992); *Telecomms. Research & Action Ctr.*, 750 F.2d at 79.

Because this procedural right is designed to protect human health, particularly the health of infants and young children, the showing required to establish standing is especially modest. *See Mass.*, 549 U.S. at 517–18. EPA's continued inaction increases the risk that pesticide residues remain in foods consumed by children without the statutorily required determination that those residues are safe. That increased risk is sufficient to establish injury in fact.

EPA's failure to act has independently injured EWG as an organization. An organization suffers injury in fact when agency action or inaction "perceptibly impairs" its ability to carry out its mission and forces it

to divert resources. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). EWG is a nonprofit organization dedicated to empowering people to live healthier lives in a healthier environment. APP-073; Walsh Decl. ¶3. It advances that mission through scientific research and widely used consumer-facing tools that inform the public about chemical exposures, particularly those affecting infants and children. APP-073; Walsh Decl. ¶3.

EPA's prolonged failure to respond to the Petition has directly impaired those activities. APP-076; Walsh Decl. ¶9. Without a final agency decision addressing whether glyphosate tolerances for oats are safe for infants and children, EWG cannot accurately inform the public, assess EPA's regulatory position, or provide clear guidance to families seeking to reduce exposure.APP-076; Walsh Decl. ¶9.

That regulatory silence has created confusion among EWG's supporters and undermined its ability to fulfill its mission of providing clear, science-based guidance. APP-076; Walsh Decl. ¶9. EPA's inaction has also forced EWG to devote additional staff time and organizational resources to explaining regulatory uncertainty and responding to supporter concerns that should have been resolved through timely agency action. APP-076; Walsh

Decl. ¶10. This diversion of resources and impairment of core activities constitutes a classic organizational injury.

EWG also has standing to bring this action on behalf of its supporters. An organization has associational standing where (1) its members would have standing in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) the claims and relief do not require individual participation. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Courts have recognized that such organizations may assert associational standing where they possess the functional indicia of membership. *See American Legal Found. v. FCC*, 808 F.2d 84, 90–92 (D.C. Cir. 1987).

EWG maintains a large and identifiable base of supporters who regularly engage with its work, rely on its research and guidance, and support its activities financially.APP-075; Walsh Decl. ¶7. EWG's supporters include parents and caregivers concerned about chemical exposures in foods consumed by infants and young children. APP-075; Walsh Decl. ¶7. One such supporter is a grandparent of multiple young children who regularly consume oat-based foods and who relies on EWG's research to make informed decisions about food safety. APP-078; Hirshberg Decl. ¶¶4, 5, 8. The supporter is concerned that glyphosate residues in

oat-based foods may pose risks to children and that EPA has failed to determine whether existing tolerances adequately protect infants and young children. APP-079; Hirshberg Decl. ¶11.EPA's failure to act leaves the supporter unable to know whether the foods consumed by their family are adequately protected by federal safety standards and prolongs exposure to a pesticide that may be difficult to avoid through individual consumer choices alone. APP-080; Hirshberg Decl. ¶11. Those injuries, including uncertainty regarding safety, inability to rely on regulatory protections, and ongoing exposure to a potentially harmful substance, are concrete and particularized. Because at least one supporter would have standing to sue in his or her own right, EWG may assert associational standing.

Finally, EWG's injuries are directly traceable to EPA's failure to act and would be redressed by the relief sought. An order requiring EPA to issue a final, reviewable decision would restore the decisionmaking process Congress mandated and reduce the risk of ongoing harm, which is sufficient for Article III. *See Massachusetts v. EPA*, 549 U.S. 497, 517–18, 525–26 (2007).

## ARGUMENT

EPA's failure to respond to EWG's Petition constitutes agency action unlawfully withheld and unreasonably delayed in violation of the APA. The

governing statutes impose a clear duty on EPA to respond to properly filed petitions seeking modification of a pesticide tolerance, and EPA has offered no lawful justification for allowing that petition to remain undecided for more than seven years.

## I. EPA Has Unlawfully Withheld Action It Is Required to Take on EWG's Petition.

Mandamus is an extraordinary remedy, appropriate when a petitioner demonstrates a clear entitlement to relief and a corresponding, nondiscretionary duty on the part of the agency. *See N. States Power Co. v. U.S. Dep't of Energy*, 128 F.3d 754, 758 (D.C. Cir. 1997); *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (describing mandamus as reserved for clear violations of a duty to act). To obtain such relief, a petitioner must show that the agency has failed to perform a clear legal duty, that no other adequate means exist to secure the requested relief, and that the circumstances present compelling equitable grounds warranting judicial intervention. *See In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022); *In re Core Commc'ns, Inc.*, 531 F.3d 849, 860 (D.C. Cir. 2008); *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005). EWG satisfies each of these requirements here.

First, EPA has a clear statutory duty to respond to EWG's administrative petition seeking modification of a pesticide tolerance under the FFDCA. *See* 21 U.S.C. § 346a(d)(4)(A). The action EWG seeks to compel is discrete and legally required: a final, reviewable response resolving the Petition. EWG does not ask this Court to dictate the substance of EPA's decision or to resolve the merits of the underlying petition. Instead, it asks this Court to require that EPA make one.

EPA's duty to act was triggered years ago. EWG filed its original petition in September 2018 and amended it in March 2019. Instead, EPA has deferred resolution of the petition to the broader registration review process, stating only that it *anticipates* addressing the petition in connection with a potential decision in 2026. APP-061. But an agency's anticipation is not a commitment, and it provides no assurance that action will occur at all.

Further, EPA's failure to act is not merely delay; it is the failure to take a discrete agency action that the statute requires. *See* 5 U.S.C. § 706(1); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). EPA has already accepted the petition, developed an extensive administrative record, and conducted multiple risk assessments addressing the issues presented. By neither granting nor denying the Petition, EPA has unlawfully withheld agency action required by statute.

23

Second, EWG has a clear right to relief. The FFDCA establishes a petition process through which interested parties may seek modification of pesticide tolerances and obtain judicial review of EPA's response. 21 U.S.C. § 346a(d), (h)(1). That statutory scheme guarantees a decision, and EPA's failure to respond deprives EWG of the very process Congress provided.

Third, EWG has no other adequate remedy at law. The FFDCA permits judicial review only of final agency action. 21 U.S.C. § 346a(h)(1). Because EPA has issued no response to the Petition, there is no final, reviewable decision and no administrative recourse available to EWG. Absent mandamus, EPA's inaction would continue to evade judicial review altogether. A writ of mandamus compelling EPA to issue a final response is therefore the only adequate means of relief.

## II. The TRAC Factors Compel Mandamus Relief.

To determine whether an agency has unreasonably delayed action, this Court applies the "*TRAC* factors" established by this Court in *Telecommunications Research & Action Center v. FCC* , 750 F.2d 70, 79–80 (D.C. Cir. 1984). The *TRAC* factors include: (1) whether the time an agency takes to act is governed by a rule of reason; (2) whether Congress has provided a timetable or other indication of the expected pace of agency action; (3) whether delays that might be tolerable in the sphere of economic

regulation are less acceptable where human health and welfare are at stake; (4) the effect of expediting delayed action on competing agency priorities; (5) the nature and extent of the interests prejudiced by the delay; and (6) whether the court need find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed. *TRAC*, 750 F.2d at 80. These factors guide a holistic, equitable inquiry into whether delay is "so egregious as to warrant mandamus." *Id.* at 79.

Applied here, EPA's prolonged failure to issue a final, reviewable response to EWG's petition constitutes unreasonable delay warranting mandamus relief.

**A. EPA's Seven-Year Delay, Driven by Its Deferral to Registration Review, Violates Any Plausible Rule of Reason.**

The first TRAC factor, the "rule of reason," strongly favors relief because EPA's delay cannot be reconciled with any reasonable timeline. *See Public Citizen*, 740 F.2d at 32 (D.C. Cir. 1984) (explaining that excessive delay undermines agency accountability and creates uncertainty for affected parties); *In re American Rivers*, 372 F.3d 413, 419 (D.C. Cir. 2004) ("[A] reasonable time for agency action is typically counted in weeks or months, not years."); *In re National Nurses United*, 47 F.4th 746, 753–54 (D.C. Cir.

25

2022) (agencies may not "indefinitely postpone decisions that Congress has required them to make").

EWG filed its petition in 2018 and amended it in 2019. Rather than issuing the decision required by statute, EPA has declined to resolve the Petition and instead deferred action to the broader registration review process, stating that it would be "appropriate" to respond only after completing its ongoing review on remand and in connection with a future final registration review decision, which it merely anticipates issuing in 2026. APP-060. But an agency's anticipation is not a commitment, and it provides no assurance that action will occur at all. An agency cannot satisfy *TRAC* by postponing action to an open-ended timeline of its own making, particularly after its duty to act has long since been triggered. Courts evaluate delay based on elapsed time and statutory obligations, not on an agency's projection of future action. *See In re Center for Biological Diversity,* 53 F.4th 665 (D.C. Cir. 2022).

Seven years of inaction on a discrete statutory duty is far beyond what this Court has deemed reasonable and independently warrants mandamus relief. This Court has repeatedly granted mandamus in analogous circumstances where agencies allowed required actions to languish for years without resolution. *See In re Bluewater Network*, 234 F.3d at 1315–16

26

(finding a "blatant violation" where the agency failed to complete a required rulemaking despite taking preliminary steps); *In re Am. Rivers*, 372 F.3d 413, 419–20 (D.C. Cir. 2004) (granting relief after approximately six years of delay); *In re Core Commc'ns, Inc.*, 531 F.3d at 855–57 (holding delay unreasonable where agency failed to act within a reasonable timeframe despite ongoing proceedings); *In re Ctr. for Biological Diversity*, 53 F.4th 665, 671–73 (D.C. Cir. 2022) (compelling agency action after years of inaction in the face of a clear statutory obligation).

Furthermore, by deferring its response to a future registration review decision, EPA places resolution of the Petition on a timeline that is both uncertain and entirely within the agency's control. That approach ignores the critical distinction between EPA's obligations under the FFDCA, as amended by FQPA, and its responsibilities under FIFRA.

The FFDCA imposes a health-protective, petition-driven mandate requiring EPA to ensure, based on current evidence, that pesticide tolerances meet a "reasonable certainty of no harm," with explicit protections for infants and children. 21 U.S.C. § 346a(b)(2)(A), (C). When presented with new evidence, EPA must make a discrete determination and issue a final, reviewable decision granting or denying the petition. *Id*. § 346a(d), (h)(1).

FIFRA registration review serves a different function. It is a periodic,

27

programmatic reassessment conducted on a rolling, multi-year schedule of EPA's own design. 7 U.S.C. § 136a(g). Although it may involve consideration of similar scientific issues, it does not require EPA to resolve a specific tolerance petition or to issue a final, reviewable order addressing that petition. *See NRDC*, 38 F.4th at 43.

That distinction is dispositive. A tolerance petition triggers a discrete, nondiscretionary duty to decide, and EPA may not satisfy that obligation by deferring action to a broader regulatory process that may unfold over many years. Nor may EPA subordinate a statutory duty to a timeline of its own creation. *See Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984).

Courts have rejected this exact approach. In *League of United Latin American Citizens v. Regan*, EPA declined to resolve a tolerance petition on the ground that it would address the relevant safety issues in a future registration review. 996 F.3d at 701–03. The Ninth Circuit held that this was "one more attempt at delay" and "a total abdication of the EPA's statutory duty," emphasizing that the FFDCA's safety mandate "permits no further delay." *Id*. at 703. The court further explained that EPA's FFDCA obligations are mandatory and focused on safety, and cannot be deferred to the multi-factor balancing inherent in FIFRA registration review. *Id.* at 715. The

28

same is true here.

EPA has declined to resolve the Petition and instead tied its response to the broader registration review process, which it merely anticipates concluding in 2026. But that self-imposed, nonbinding timeline does not excuse years of inaction on a clear statutory duty.

Nothing in the FFDCA permits EPA to leave a properly filed petition unresolved while it pursues a separate, multi-year regulatory process. Where, as here, EPA declines to determine whether an existing tolerance remains safe in light of new evidence, it fails to carry out the core obligation Congress imposed.

**B. Congress's Statutory Scheme Requires Timely Agency Action.**

The second TRAC factor considers whether Congress has provided a timetable or other indication of the speed with which the agency is expected to act. *TRAC*, 750 F.2d at 80. Here, Congress's directives under the FFDCA require EPA to ensure that pesticide tolerances remain protective of public health. The statute mandates that EPA determine, based on current evidence, that a tolerance meets the standard of a "reasonable certainty of no harm," including consideration of aggregate exposure and heightened risks to infants and children. 21 U.S.C. § 346a(b)(2)(A), (C).

Although the FFDCA does not impose a date-certain deadline, it

requires EPA to issue a final, reviewable order granting or denying a petition. *Id*. § 346a(d), (h)(1). That obligation must be carried out within a reasonable time under the APA. *See* 5 U.S.C. § 555(b). EPA's prolonged inaction is incompatible with this framework. A tolerance cannot satisfy the FFDCA's safety standard if EPA declines to assess whether new evidence renders it unsafe. By failing to act, EPA is not preserving the status quo and is allowing an existing tolerance to persist without the determination Congress requires.

The statute's structure confirms this conclusion. By conditioning judicial review on a final agency decision, Congress ensured that tolerance determinations remain subject to oversight and cannot be left indefinitely unresolved. Allowing EPA to delay for years, while deferring to a separate process with no binding deadline, would effectively insulate its inaction from review and nullify the petition process Congress established.

Accordingly, the second TRAC factor strongly favors relief.

**C. EPA's Delay Is Especially Intolerable When Children's Health Is at Stake.**

The third TRAC factor, which recognizes that delays are "less tolerable when human health and welfare are at stake," strongly favors relief because EPA's delay directly implicates human health, particularly the health of infants and young children.

30

Courts have consistently held that delay is least tolerable where human health is at stake. In *Public Citizen Health Research Group v. Commissioner, FDA*, the D.C. Circuit recognized that prolonged inaction on matters affecting health may warrant judicial intervention, particularly where delay denies petitioners the process Congress guaranteed. 740 F.2d at 32.

Most directly, in *In re Center for Biological Diversity*, the court granted mandamus where EPA failed for years to complete a legally required determination concerning a pesticide, holding that such inaction unlawfully frustrated judicial review and violated statutory mandates designed to protect health and the environment. 53 F.4th 665, 671–74 (D.C. Cir. 2022). The court emphasized that mandamus is appropriate where delay becomes "so egregious as to warrant judicial intervention," particularly where Congress has prioritized protection of health and safety. *Id*. at 672–73.

EWG's petition concerns widespread dietary exposure to glyphosate, a pesticide to which EPA has acknowledged infants and young children experience higher dietary exposure. APP-067; Dr. Andrews Decl. ¶8. EPA's own dietary risk assessments identify children aged one to two years as the population subgroup with the highest exposure to glyphosate relative to body weight. APP-067; Dr. Andrews Decl. ¶8.  That elevated exposure reflects differences in consumption patterns and body weight, resulting in

31

higher exposure on a per-body-weight basis for young children. Separately, young children may be more susceptible to the effects of chemical exposure during critical developmental periods. APP-054, 067-68; Dr. Andrews Decl. 7, 9. Congress, through the FQPA, expressly recognized that infants and children face heightened susceptibility to pesticide exposure and required EPA to apply an additional margin of safety to protect against those risks. 21 U.S.C. § 346a(b)(2)(C); *see also id*. § 346a(b)(2)(A)(ii). That statutory mandate underscores that delays in evaluating potentially unsafe tolerances are particularly unacceptable where children's health is at stake.

The administrative record demonstrates that this glyphosate exposure is routine and ongoing. Oat-based foods, widely consumed by infants and young children, are a significant source of dietary glyphosate exposure, and residue levels in those foods are directly governed by the tolerance and agricultural practices challenged in the petition. APP-001, 014, 067; Dr. Andrews Decl. ¶7. Testing and biomonitoring evidence cited in the petition confirms that dietary exposure results in measurable internal exposure at the population level, meaning that EPA's continued inaction permits ongoing exposure under a regulatory threshold that has never been affirmatively reassessed in response to the petition. APP-068; Dr. Andrews Decl. ¶10.

Scientific concern regarding glyphosate exposure further heightens the

urgency of agency action. As documented in the petition, authoritative scientific bodies have identified potential carcinogenic risks, and EPA itself has acknowledged unresolved scientific questions and data gaps regarding long-term and childhood exposure. APP 009-10. These uncertainties do not justify delay.

EPA's delay perpetuates potential exposure under a regulatory standard that EPA has never revised in response to the petition's evidence. This Court's precedent makes clear that where an agency fails for years to resolve a petition implicating public health, despite developing a record and acknowledging its obligation to act, the delay is unreasonable as a matter of law. *See In re Ctr. for Biological Diversity*, 53 F.4th 665, 671–73 (D.C. Cir. 2022) (compelling action after years of delay); *Pub. Citizen Health Research Grp. v. Comm'r, FD*A, 740 F.2d 21, 32 (D.C. Cir. 1984) (recognizing that delay is least tolerable where health is at stake). Because EPA's inaction here prolongs ongoing exposure affecting a population Congress identified as uniquely vulnerable, this factor weighs heavily in favor of mandamus relief.

**D. EPA's Delay Prejudices Statutory Interests and Frustrates Judicial Review.**

The fifth TRAC factor, which considers the nature and extent of the interests prejudiced by delay, strongly favors mandamus relief. Under this factor, courts assess not only concrete harms, but also whether agency delay

33

deprives parties of statutory procedures designed to protect their interests and ensure accountability. *See Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984); *TRAC*, 750 F.2d at 80.

Congress provided for direct court of appeals review of EPA's final tolerance determinations under the FFDCA. 21 U.S.C. § 346a(h)(1). But EPA's failure to issue any final, reviewable decision prevents that jurisdiction from ever attaching. In practical effect, EPA's inaction prevents judicial review from occurring at all and deprives EWG of the review mechanism Congress expressly provided.

That is precisely the circumstances in which mandamus relief is warranted. As this Court recognized in *TRAC*, agency delay constitutes a cognizable injury where it precludes judicial review and frustrates the statutory scheme Congress enacted. *TRAC*, 750 F.2d at 80. Here, EPA's prolonged failure to act does not merely delay review, it prevents it altogether. By withholding a final decision, EPA effectively insulates its inaction from review and deprives both EWG and this Court of the opportunity to assess whether the agency is complying with its statutory obligations.

Absent judicial intervention, EPA may continue to defer action indefinitely, frustrating both the statutory scheme and this Court's ability to

exercise its assigned role.

**III. The Court should issue a writ of mandamus and retain jurisdiction to ensure EPA promptly resolves the petition.**

EPA has unlawfully withheld or unreasonably delayed action on a matter it is legally required to decide. A writ of mandamus, or an order compelling agency action under the APA, is therefore appropriate. *See* 5 U.S.C. § 706(1); 28 U.S.C. § 1651(a). EPA has a clear duty to respond to EWG's petition, has failed to do so for years, and has offered no concrete timeline for decision.

Requiring EPA to act imposes no undue burden. EWG does not seek to dictate the substance of EPA's decision, but only to require that EPA make one. Continued delay, by contrast, perpetuates regulatory uncertainty, frustrates Congress's protections for children's health, and deprives EWG of the process the statute guarantees.

The need for relief is particularly acute because Congress vested this Court with exclusive jurisdiction to review EPA's tolerance decisions under the FFDCA. EPA's failure to issue a final, reviewable response prevents that jurisdiction from ever attaching. Mandamus relief is necessary to preserve the Court's ability to exercise its statutory role.

EWG seeks a date-certain order requiring EPA to issue a final,

35

reviewable response resolving the petition. A firm deadline of sixty (60) days is warranted given EPA's prior commitment to act and its failure to do so. Courts have recognized that open-ended directives are inadequate where an agency has demonstrated prolonged delay and must instead impose concrete deadlines to ensure compliance with statutory obligations. *See In re Core Commc'ns, Inc.*, 531 F.3d at 862; *In re Am. Rivers*, 372 F.3d at 419–20; *In re Bluewater Network*, 234 F.3d at 1315–16.Where, as here, an agency has failed to act despite a clear statutory duty and ample time to do so, only a firm deadline can ensure meaningful relief.

The Court should also retain jurisdiction to ensure compliance. *See In re Ctr. for Biological Diversity & Ctr. for Food Safety*, 53 F.4th at 673. Retaining jurisdiction would not intrude on EPA's discretion but would ensure that the agency performs the discrete, legally required act of issuing a final decision.

## CONCLUSION

EPA has allowed EWG's glyphosate petition to languish for years. That prolonged inaction is unreasonable, especially in light of the risks to infants and young children, and violates the APA, undermines the FFDCA's protections for infants and children, and frustrates this Court's exclusive jurisdiction to review EPA's tolerance decisions. Mandamus relief is

therefore warranted to compel EPA to perform the discrete, legally required

act of issuing a final, reviewable response resolving the petition within sixty

(60) days of the Court's order.

Respectfully submitted this 21st day of April, 2026.

*/s/ Caroline Leary*
Environmental Working Group
1250 I St NW, Suite 1000
Washington, DC 20005
(202) 667-6982
cleary@ewg.org

**CERTIFICATE OF COMPLIANCE**

This document complies with the page limit of Federal Rule of Appellate Procedure 21(d) because it contains 7,644 words. This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 21, 2026

*/s/ Caroline Leary*
Caroline Leary

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served a copy of the foregoing Petition for a Writ of Mandamus and the accompanying statutory addendum and appendix upon all parties by U.S. mail or hand delivery at the following addresses:

Sean Donahue, General Counsel
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Mail Code: 2310A
Washington, DC 20460

Lee Zeldin, Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Mail Code: 1101A
Washington, DC 20460

Todd Blance, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Dated: April 21, 2026

*/s/ Caroline Leary*
Caroline Leary